```
                       UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF MISSOURI
                            NORTHERN DIVISION


VICKERS BRADFORD                    )
                                    )
              Plaintiff,            )
                                    )
         v.                         )         No. 2:10 CV 15 DDN
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
              Defendant.            )
```

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Vickers Bradford for disability insurance benefits under Title II of the Social Security Act, and supplemental security income under Title XVI of the Act, 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 10.) For the reasons set forth below, the ALJ's decision is affirmed.

## I. BACKGROUND

Plaintiff Vickers Bradford was born on November 14, 1955. (Tr. 92.) He is 6'4" tall and weighs approximately 200 pounds. (Tr. 156.) He is married to Janet Bradford, and has one child who lives with his ex-wife. (Tr. 93.) He completed high school and two years of electronics trade school. (Tr. 214, 248.) He last worked in January, 2008 at a Hallmark card factory. (Id.)

On February 4, 2008, Bradford applied for supplemental security income and disability insurance benefits, alleging he became disabled on September 1, 2006 on account of blindness of one eye, depression, and problems with his back and knees. (Tr. 92, 99, 157.) He received a notice of disapproved claims on March 4, 2008. (Tr. 38-41, 55-60.) On April 21, 2008, he filed a written request for a hearing before an Administrative Law Judge (ALJ). (Doc. 61.) After a hearing on May 8,

2009, the ALJ denied benefits on August 25, 2009.  (Tr. 45-52.)  On January 8, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 1-3.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

Bradford earned income, though somewhat sporadically, from 1973 to 2008.  From 1973-1977, he earned less than $250 each year, and some years had no earnings.  In 1978, he earned nearly $3,000, and in 1979, he earned about $10,000.  From 1980-1987, he earned less than $1,600 each year, and had no income during four of those years.  From 1988-1991, he earned about $10,000 each year. After earning about $5,000 in 1992, he earned between $11,000 and $21,000 each year from 1994-2005.  He earned about $3,000 in 2006, about $7,000 in 2007, and about $1,000 in 2008.  He had no earnings in 2009.  (Tr. 118-19.)  He typically worked as a laborer and factory worker.  (Tr. 131.)

On March 15, 2004, Bradford was treated by T.R. Woltanski, M.D., for a sinus infection.  (Tr. 207.)  Dr. Woltanski noted that Bradford had poor transillumination[1] with thick yellow and green drainage and post nasal drainage. (Id.) Dr. Woltanski prescribed Doxycycline[2] and Sudafed. (Id.)  On August 8, 2005, Bradford saw Dr. Woltanski for treatment for another sinus infection.  (Id.)  Dr. Woltanski prescribed Keflex 500,[3] Vicks 44, and Tylenol, and was told to follow-up with additional appointments as needed.  (Id.)

---

[1]Transillumination is a method of examination by the passage of light through tissues or a body cavity.  Stedman's Medical Dictionary 2018 (28th ed. 2006).

[2]Doxycycline is used to treat a wide variety of bacterial infections.  http://www.webmd.com/drugs/index-drugs.aspx (last visited January 14, 2011).

[3]Keflex is used to treat a wide variety of bacterial infections. It is known as a cephalosporin antibiotic.  It works by stopping the growth of bacteria.  http://www.webmd.com/drugs/index-drugs.aspx (last visited January 14, 2011).

On March 3, 2008, Bradford visited Craig S. Heligman, MD, MS, for a consultative medical examination. (Tr. 213.) Dr. Heligman noted that Bradford arrived on time for the appointment and was pleasant and cooperative during the interview and examination. (Id.) Dr. Heligman's report stated that Bradford lost vision in his left eye due to a shotgun accident when he was 11 years old. (Id.) The report also stated that plaintiff reported that his knees lock after standing for 30 minutes, and that his knees take 10 minutes to loosen thereafter. (Id.) Bradford stated that he had not sought treatment for his knees and only used over-the-counter medications for treating the pain. (Id.) Bradford also stated that his back hurts when he bends or twists, and he develops a pain between his shoulder blades if he works with his arms extended. (Id.) The report indicates that Bradford believed he had carpal tunnel syndrome in both hands, and that he was suffering from depression. (Tr. 213.) Bradford stated that he can walk a quarter of a mile, stand for 30 minutes, sit for an unrestricted period, lift and carry 30-50 pounds, and is able to drive a car without restriction. (Tr. 214.) Bradford reported no limitation in his ability to provide self-care and personal hygiene, eat and prepare food, communicate, and clean and care for his residence. (Id.)

Dr. Heligman stated that Bradford appeared well developed, well nourished, and in no acute distress. (Id.) Dr. Heligman noted that Bradford showed no signs of discomfort while seated in a chair or on the examination table, was able to sit without fidgeting or changing position, and was able to mount and dismount the examination table without assistance. (Id.) Dr. Heligman noted that Bradford's shoulders, elbows, forearms, and wrists demonstrated full strength and range of motion, and that he had full upper and lower extremity motor strength. (Tr. 215.) Dr. Heligman also noted that Bradford could extend his hands, make a fist, and had a normal grip strength. Although Bradford's Phalen sign[4] was positive bilaterally, his Tinel sign[5] was negative. (Id.) Dr.

---

[4] During a Phalen's sign test, the patient rests his elbows on a flat surface, such as a desk, with his elbows bent and his forearms up. He then flexes his wrists, letting his hands hang down for about 60 seconds.
(continued...)

Heligman opined that Bradford suffered from nonspecific back pain, bilateral knee pain, bilateral carpal tunnel syndrome, and traumatic enucleation of the left eye. (Tr. 217.) Dr. Heligman also opined that Bradford was capable of performing a medium exertional level of work — constantly lifting 10 pounds, frequently lifting 20 pounds, and occasionally lifting 50 pounds. (Id.) Dr. Heligman also opined that Bradford did not suffer from any mental impairments that might hinder work-related activities. (Id.)

On March 4, 2008, Cara Falter, a medical consultant, completed a physical residual functional capacity assessment form. (Tr. 221-26.) Ms. Falter opined that Bradford could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and that Bradford had no other limitations regarding his ability to push and/or pull, no manipulative limitations, and no visual limitations. (Tr. 222-24.)

On October 3, 2008, Mark W. Schmitz, MS, performed a psychological examination of Bradford upon the request of the Randolph County Family Support Division of the Missouri Department of Social Services to determine his eligibility to receive medical services through Medicaid. (Tr. 245-50.) Mr. Schmitz reported that Bradford stated that he has been self-conscious about his appearance since the shotgun accident, and that he feels uncomfortable around other people because he believes that if they are looking at him or talking in low voices, they are talking about him. (Tr. 246.) Although Bradford has had a glass eye before, his eye

---

[4](...continued)
If the patient feels tingling, numbness, or pain in the fingers within 60 seconds, he may have carpal tunnel syndrome. http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited January 14, 2010).

[5]During a Tinel's sign test, the patient's doctor taps on the inside of the patient's wrist over the median nerve. If the patient feels tingling, numbness, "pins and needles," or a mild "electrical shock" sensation in his hand when tapped on the wrist, he may have carpal tunnel syndrome. http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited January 14, 2010).

socket is now too damaged to use a glass eye.  (Id.)  Bradford reported no history of treatment for emotional problems since he was 8 years old, and had never been prescribed medications for emotional difficulties. (Id.)  Bradford also reported a history of spontaneous crying spells, but that he has not had any for a couple of years.  (Tr. 249.)  Bradford also stated that he used to enjoy hunting and fishing, but over the past couple of years he has not hunted at all, and has fished only a few times.  (Id.)  Bradford stated that he does not get enthused about anything anymore, that some days he feels like the world is against him, that he cannot stay interested in books anymore, and that he typically spends his day playing computer games and watching television.  (Id.)

Mr. Schmitz diagnosed Bradford with Anxiety Disorder Not Otherwise Specified, and a Major Depressive Disorder of Moderate Proportions. (Id.)  Mr. Schmitz ultimately opined, however, that Bradford's level of anxiety and depression did not rise to the level of a mental disability preventing him from engaging in employment, although Bradford would probably benefit from anti-depressant and/or anti-anxiety medication and/or counseling.  (Id.)  Mr. Schmitz assigned Bradford a GAF level of 62.[6]

On March 23, 2009, Richard Kaspar, PhD, completed a psychiatric review of Bradford.  (Tr. 227-37.)  Dr. Kaspar opined that Bradford did not suffer from a medically determinable impairment.  (Tr. 227.)

---

[6]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patient's GAF score represents the worst of the two components.
On the GAF scale, a score from sixty-one to seventy represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy), but the individual generally functions well and has some meaningful interpersonal relationships.  Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

**Testimony at the Hearing**

On May 8, 2009, Bradford testified before the ALJ. He last worked in a factory in January 2008, and can no longer do so because, if he stands for more than 30 minutes, his left knee locks; if he lifts more than 20 pounds repeatedly, he has severe pain across his lower back; and if he works with his hands in front of him, he has sharp pain between his shoulder blades at the base of his neck. (Tr. 12.) He also has only one eye due to a shotgun accident when he was 11 years old. (Id.) As a result, he has no depth perception, and he has sinus infections and sinus headaches two or three times a month for two or three days at a time. (Tr. 19-20.) He rated the pain from the sinus headaches from 7 to 9 out of 10, with zero being no pain at all and ten being the worst pain he could imagine or ever suffered. (Tr. 20.) He cannot wear a glass eye because the muscles in his eye socket have deteriorated, and he cannot wear a patch because it makes his cheek raw. (Tr. 12-13.)

Bradford also testified that he has difficulty affording medical care, and that he applied for and was denied Medicaid. (Tr. 13.) He did not think that he appealed the denial, and was not aware of any income-based clinics where he lived. (Tr. 13-14.)

If Bradford returned to working in a factory, his body would be so stiff and sore after working for two days that he would need to take a day off. (Id.) He gets a dull, aching pain in his lower back and side when he lifts or stands for extended periods of time, and has to lay down or sit in a soft chair to relieve the pain. (Tr. 14-15.) He rated the pain in his back at 7 out of 10. (Tr. 15.) He did not think he could work in a sedentary job, because he gets pain between his shoulder blades and at the base of his neck when he works with his arms in front of him; he can only sit in an office chair for about 30 minutes; he can sit for four or six hours out of an eight-hour day; he can stand for about an hour at a time and about four hours total in an eight-hour workday; he can lift 15-20 pounds frequently and 25 pounds occasionally; and he would need to lie down for about 15 minutes every hour or hour and a half in a normal workday. (Tr. 17, 21-22.) Wear on his body from a previous factory job gradually caused his pain and physical limitations. (Tr. 22.) He does not exercise or stretch his muscles at home. (Tr. 28-29.)

Bradford also testified that he believed he was depressed, although he has never been treated for depression by a doctor. (Tr. 15.) He used to hunt and fish often, but no longer has the ambition for them. (Tr. 16.) He also testified that he does not like being around people because he thinks they are staring at him and when they talk in low voices he thinks they are talking about him. (Id.) As a result, he did not think that he could work with the public. (Tr. 17.) He was not as self-conscious when he used a glass eye or wore an eyepatch, but he can no longer wear a glass eye because the muscles in his eye socket are not strong enough, and he cannot wear an eyepatch because it causes too much irritation. (Tr. 16.)

Bradford testified that his left knee locks when he has to stand, and he has to walk around for about 15 minutes to loosen it up so that he can bend it again. (Tr. 17.) The pain in his knee is sharp and stabbing, and he rated his left knee pain at 8 out of 10, and his right knee at 6 out of 10. (Tr. 18.) Lifting and climbing stairs worsens his knee pain. (Tr. 17.)

In a typical day, Bradford sleeps six or seven hours at night, waking up every couple of hours, and naps some days. (Tr. 31.) During the day, he checks his e-mail on his computer, talks to his wife, and does other activities. (Tr. 31.) He has a driver's license, and last drove a week before the hearing. (Tr. 33-34.)

Janet Bradford also testified. She and Bradford live together, and had been married for three years at the time of the hearing. (Tr. 23-24.) Janet Bradford testified that after Bradford works for a few days, he can barely move, and has significant drainage from his eye, which she believes is infected. (Tr. 24.) Bradford has difficulty with his balance when doing yard work or carrying objects. (Tr. 25.) He cannot perform sit-down work because he would need to stand up often, and he is depressed. (Id.) He no longer wants to attend social functions, such as a family reunion or get-together, and is withdrawn, although he is happy sometimes. (Tr. 25-26, 35.) He helps with the chores and takes out the trash, with some help from his wife. (Tr. 26.)

## III. DECISION OF THE ALJ

The ALJ found that Bradford suffered from a depressive disorder, possible carpal tunnel syndrome, and loss of sight in his lift eye, but that he did not have a severe impairment or combination of impairments. (Tr. 47.) In reaching this conclusion, the ALJ considered Bradford's symptoms and the opinion evidence. In particular, the ALJ found that Bradford's impairments could be expected to produce some of the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (Tr. 48-52.)

The ALJ found that only minimal medical evidence supported Bradford's allegations. Although Bradford is missing his left eye, the ALJ found no evidence that this loss significantly impacted his ability to work. The ALJ noted that Bradford was able to work from 1988 through 2005 despite the loss of his left eye, and believed that Bradford has learned to compensate for the loss. (Tr. 51.)

The ALJ found no evidence of treatment of Bradford's sinus infections since August, 2005. The ALJ inferred that because Bradford did not follow-up with Dr. Woltanski, the prescribed treatment likely worked. The ALJ also noted that Bradford has been able to work despite his sinus problems. (Id.)

The ALJ relied primarily on Dr. Heligman's diagnosis in finding that Bradford's bilateral carpal tunnel syndrome was not severe. The ALJ noted that Dr. Heligman did not indicate whether the condition would impact Bradford's ability to work. The ALJ also noted that Dr. Heligman's diagnosis was based solely on Bradford's subjective response to testing, and that no nerve testing was conducted to confirm the diagnosis. The ALJ also relied on Bradford's normal grip strength and that Bradford could make a fist and fully extend his hands. The ALJ further noted that there was no evidence of atrophy, and that Bradford had normal upper extremity strength and no difficulty with gross or fine manipulation. The ALJ also relied on Janet Bradford's statements that Bradford typically plays computer games, which suggests he was not experiencing hand or wrist pain. (Id.)

The ALJ also found that Bradford did not suffer from a severe mental illness. The ALJ relied on Mr. Schmitz's GAF score determination, which rated the severity as only mild even without treatment, and Mr. Schmitz's finding that Bradford's mental illnesses were not severe enough to prevent him from engaging in employment. The ALJ also noted that Bradford's application for Medicaid benefits was denied. (Id.)

The ALJ also considered Bradford's motivation for applying for disability benefits. Bradford told Mr. Schmitz that he last worked in January, 2008, and that he quit despite having worked there for seven months. The ALJ noted that Bradford did not imply that he could no longer perform the work, but that Bradford stated that he had trouble finding a job that he could maintain, so he applied for disability benefits. (Id.)

The ALJ considered Bradford's ability to perform basic work activities, accepting as true all symptoms to the extent that they were consistent with the objective medical evidence, opinion evidence, and other evidence. (Tr. 48.)

The ALJ also considered the four functional areas for evaluating mental disorders set forth in 20 C.F.R. Part 404, Subpart P, App'x 1. The ALJ found that Bradford's medically determinable mental impairment caused only a mild limitation of any of the first three areas and no episodes of decompensation of extended duration. (Tr. 52.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary

outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Bradford did not suffer from any severe impairments, and ended the analysis at Step Two.

## V. DISCUSSION

Bradford argues generally that the ALJ's decision is not supported by substantial evidence. More specifically, he argues, first, that the ALJ failed to properly evaluate his claims that his left eye loss, depression, carpal tunnel syndrom, and sinus infections constituted severe impairments. Second, he argues that the ALJ improperly weighed his testimony. (Doc. 15.)

## A. Step Two of the Evaluation Process

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007). The claimant bears the burden of proving his impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant. Id.; Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ." Kirby, 500 F.3d at 707; see also Germany-Johnson v. Comm'r of Soc. Sec., 313 Fed. App'x 771, 774 (6th Cir. 2008) (per curiam) ("[S]tep-two severity review is used primarily to screen out totally groundless claims.").

An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby, 500 F.3d at 707; 20 C.F.R. § 404.1521(a). Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id. The sequential evaluation process ends at Step Two if the impairment has no more than a *minimal* effect on the claimant's ability to work. Kirby, 500 F.3d at 707; Hudson v. Bowen, 870 F.2d 1392, 1396 (8th Cir. 1989).

### 1. Blindness of His Left Eye

That a claimant works with an impairment for years "demonstrate[s] the impairments are not disabling in the present" absent evidence of significant deterioration of his condition. Goff v. Barnhart, 421 F.3d

785, 792-93 (8th Cir. 2005); Cagle v. Astrue, No. 1:09 CV 40 HEA/MLM, 2010 WL 1539111, at *9 (E.D. Mo. Mar. 30, 2010).

Bradford did not present any evidence to the ALJ that the loss of his left eye affected his ability to work. The only mention of the loss of his left eye being an impairment is that it affects his depth perception, although he testified that he is still able to drive a car. (Tr. 34.) Based on Bradford's earnings record since the accident and the lack of evidence that the loss of his left eye impairs his ability to work, the ALJ did not err in finding the loss of his left eye is not a serious impairment. See, e.g., Moore v. Astrue, No. 09-223-DLB, 2010 WL 3394664, at *3-4 (E.D. Ky. Aug. 24, 2010) (affirming ALJ's finding that blindness in one eye was not a severe impairment because the plaintiff had several jobs, drove a car, went grocery shopping, cleaned her house, and did her laundry despite the blindness); Thompson v. Astrue, No. 5:07 cv 741, 2009 WL 817330, at *11 (S.D. W. Va. Mar. 27, 2009).

**2. Depression**

Under the regulations, the ALJ evaluates the severity of mental impairments by gauging their impact on four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. Cuthbert v. Astrue, 303 Fed. App'x 697, 699 (11th Cir. 2008) (per curiam); 20 C.F.R. § 404.1520a(c)(3). If the ALJ rates the claimant's limitations as "none" or "mild" in the first three areas, and "none" in the fourth area, the ALJ will generally conclude that the claimant's mental impairments are not severe — *unless* the evidence indicates that there is more than a *minimal limitation* in the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520a(d)(1).

The ALJ found that Bradford's medically determinable mental impairment caused no more than a "mild" limitation in any of the first three functional areas, and "no" episodes of decompensation of extended duration in the fourth area. (Tr. 52.) Limitations that are only mild and moderate undermine allegations of severity. George v. Astrue, 301 Fed. App'x 581, 582 (8th Cir. 2008) (per curiam).

The ALJ noted that Mr. Schmitz opined that Bradford's mental impairments would not prevent him from engaging in employment, that Bradford had never been treated for depression, and that Bradford's application for Medicaid had been denied. The ALJ relied on Mr. Schmitz's GAF assessment of 62, which suggested only mild symptoms. Bradford only offered his own testimony and Mr. Schmitz's recommendation for medication and counseling, and diagnosis of a moderate depressive order. (Tr. 52.) "The lack of objective medical basis to support [the] [c]laimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints." Gibson v. Astrue, No. 1:09 CV 111 TIA, 2010 WL 3782011, at *12 (E.D. Mo. Sept. 21, 2010). Given the absence of objective medical evidence to support Bradford's claim of depression and the existence of conflicting medical evidence, the court cannot say that the ALJ's opinion did not rest on substantial evidence. See Winfield v. Barnhart, 269 F. Supp. 2d 995, 1007-08 (N.D. Ill. 2003); Valley v. Barnhart, No. Civ. 02-338-M, 2003 WL 22249863, at *6-8 (D.N.H. Sept. 30, 2003).

### 3. Carpal Tunnel Syndrome

Regarding Bradford's carpal tunnel syndrome, the ALJ found that, although Dr. Heligman diagnosed Bradford with bilateral carpal tunnel syndrom, Dr. Heligman did not indicate whether the condition would impact Bradford's ability to work. The ALJ also noted that Dr. Heligman's diagnosis was based on the subjective Phalen's test, and that there was no nerve testing to confirm the diagnosis. Further, Dr. Heligman noted that Bradford has normal grip strength, could make a fist and oppose fingers, and could fully extend his hands, and that Bradford had normal upper extremity strength. There was no evidence that Bradford had difficulty with gross or fine manipulation. (Tr. 51.) While the ALJ could have found that Dr. Heligman's diagnosis of bilateral carpal tunnel syndrom was a severe impairment, given the lack of supporting diagnoses, treatment plans, or other objective medical evidence, the court cannot say that the ALJ erred. Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009) ("If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the ALJ's findings, the court must affirm the ALJ's decision."). See Miller v. Astrue, 2009 WL 455255, at *3 (W.D. Mo. Feb. 18, 2009) (ALJ did not err in finding that claimant's carpal tunnel syndrome was not severe because "the physician diagnoses were not accompanied by clinical findings and [the claimant's] condition had not resulted in any work-related restrictions . . ."). See also Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995).

The ALJ also noted that Bradford's wife stated that during a typical day, Bradford played computer games, which the ALJ found to indicate that he was not having serious hand or wrist pain. Activities inconsistent with a claimant's alleged disability undermine a claimant's contention that the impairment is severe. Butler v. Astrue, 242 Fed. App'x 373, 375 n.2 (8th Cir. 2007) (per curiam); Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003). See also Woodson v. Barnhart, 2004 WL 1102363, at *6-7 (E.D. Pa. May 11, 2004) (carpal tunnel syndrome was not severe because none of the claimant's physicians opined that it significantly limited her physical ability to perform basic work activities and because plaintiff's testimony of her daily activities suggested the impairment was not severe).

In addition, Bradford did not claim disability due to carpal tunnel syndrome on his application (Tr. 157), which is inconsistent with the alleged severity of the impairment. Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994).

Therefore, the ALJ did not err in finding that Bradford's carpal tunnel syndrome was not a serious impairment.

### 4. Sinus Infections

The ALJ found that, although Bradford may suffer sinus infections occasionally, Bradford's sinus infections are not a serious impairment because Bradford continued to work despite suffering from them, and because Bradford did not seek treatment for a sinus infection since August 2005. Goff, 421 F.3d at 792-93; Cagle, 2010 WL 1539111, at *9.

The only objective medical evidence Bradford submitted regarding his sinus infections were treatment notes for two sinus infections, over a year apart, and both over a year before his alleged onset date. Bradford

did not proffer evidence regarding the alleged regularity or severity of his sinus infections, nor did he produce additional treatment notes from Dr. Woltanski, or any other physician, regarding his sinus infections. "[Bradford] had the burden to make sure the record contained at least some objective evidence to suggest a reasonable possibility that a severe impairment existed." Bryant v. Astrue, 4:08 cv 449 BD, 2009 WL 2982848, at *3 (E.D. Ark. Sept. 15, 2009). See also 20 C.F.R. §§ 404.1529(c), 416.929(c).

Given the lack of objective medical evidence that Bradford suffered from severe, chronic sinus infections, and given that Bradford was able to work while suffering from the alleged sinus infections, the ALJ did not err in finding that Bradford's alleged sinus infections were not severe.

**B. Bradford's Credibility**

The ALJ found Bradford's statements concerning the intensity, persistence and limiting effects of his alleged symptoms were not credible to the extent that they conflicted with the finding that Bradford did not suffer from a severe impairment. (Tr. 50.)

When weighing a claimant's testimony, the ALJ must take into account the Polaski factors, which include: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) any functional restrictions. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). However, the ALJ's decision need not discuss the relation of every Polaski factor to the claimant's credibility. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).

The credibility of a claimant's subjective testimony is primarily a decision for the ALJ, not the courts. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). While an ALJ may not disregard subjective complaints solely because they are not fully supported by medical evidence, the ALJ may discount such complaints if they are inconsistent with objective medical findings. Ramirez v. Barnhart, 292 F.3d 576, 582 (8th Cir. 2002). Deference is given to the ALJ's credibility

determinations so long as they are supported by good reasons and substantial evidence. Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005).

Bradford argues that the ALJ's credibility analysis was improper because (1) the ALJ mistakenly discredited his testimony because of his lack of treatment; (2) the ALJ did not consider his work history; and (3) the ALJ did not consider each of the Polaski factors. For the reasons discussed below, the court disagrees.

**1. Lack of Treatment**

"A claimant may not be penalized for failing to seek treatment he cannot afford." Skovlund v. Astrue, No. CIV 08-4078, 2009 WL 3055421, at *24 (D.S.D. Sept. 24, 2009). An inability to pay may justify a claimant's failure to seek medical care. Vasey v. Astrue, No. 1:08 CV 46 SWW/JTR, 2009 WL 4730688, at *5 (E.D. Ark. Dec. 3, 2009). That said, a claimant must present "supporting evidence" that his failure to seek medical treatment was due to the expense. George, 301 Fed. App'x at 582.

While Bradford testified that he did not have insurance and was denied Medicaid, he did not testify that he was ever denied medical treatment for his conditions due to poverty or lack of insurance. Routh v. Astrue, 698 F. Supp. 2d 1072, 1079 (E.D. Ark. 2010). The ALJ is in the best position to determine a claimant's motivation for not seeking medical attention. When a claimant contends he cannot afford medical care, it is for the ALJ to decide whether a claimant's real motivation for failing to seek medical attention was based on financial difficulties. Cooper v. Barnhart, No. 04-3476-CV-S-GAF-SSA, 2005 WL 2065243, at *4 (W.D. Mo. Aug. 24, 2005) (citing Hutsell v. Sullivan, 892 F.2d 747, 750 n.2 (8th Cir. 1989)); Vasey, 2009 WL 4730688, at *6. Given the findings of Bradford's physicians that his impairments were not severe, and that Bradford worked while suffering from the impairments, the ALJ did not err in believing Bradford did not seek additional medical care because his impairments were not severe instead of because he could not afford additional care.

That Bradford was denied Medicaid does not automatically excuse him from seeking alternative means for obtaining medical care. See, e.g.,

Hadley v. Astrue, 2009 WL 1634907, at *10 (W.D. Ark. June 10, 2009) (finding that "the ALJ did not err in criticizing Plaintiff for failing to seek physical therapy, even if that therapy was not covered by Medicaid").

In addition, Dr. Heligman's consultative medical examination report and Mr. Schmitz's psychological examination report state that Bradford smokes at least one pack of cigarettes each day and consumes six to twelve beers weekly. (Tr. 214, 246.) This undermines his claim that he could not afford medical treatment. Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999); Turner v. Astrue, No. 4:08 CV 107 CAS, 2009 WL 512785, at *12 (E.D. Mo. Feb. 27, 2009) ("In addition, although Plaintiff claims that he could not afford his medication, the ALJ properly relied upon the fact that Plaintiff did not forgo smoking to help finance his medication.").

The ALJ also relied on the fact that none of Bradford's physicians diagnosed him with a severe disability, and no physician placed restrictions on his activities due to any of the alleged impairments. As a result, there is substantial evidence supporting the ALJ's credibility determination. Banks v. Massanari, 258 F.3d 820, 827 (8th Cir. 2001).

**2. Work History**

"A lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall, 274 F.3d at 1218 (citation omitted). See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010); Bryant v. Astrue, No. 4:07 CV 802 ERW, 2008 WL 3896024, at *10 (E.D. Mo. Aug. 18, 2008). However, a strong work history generally bolsters a claimant's disability claim. Curran-Kicksey v. Barnhart, 315 F.3d 964, 969-70 (8th Cir. 2003); Barton v. Astrue, 549 F. Supp. 2d 1106, 1121 (E.D. Mo. 2008).

That Bradford worked for many years generally bolsters his credibility, but his ability to work despite the existence of at least some of the alleged impairments undermines their alleged severity. See Bryant, 2008 WL 3896024, at *10.

In addition, according to Mr. Schmitz's psychological evaluation report, Bradford quit his most recent job at a Hallmark card factory in January, 2008 "after [his employers] told him that he had excessive body odor, and that he needed to go home and take a shower and bring deodorant back with him so that he could put it on periodically during the day." The report further states that Bradford "has been having some trouble finding a job that he 'can stick with,' so he decided to apply for Social Security Disability benefits and Medicaid." (Tr. 248). That Bradford quit his most recent job for a reason other than his medical condition further supports the ALJ's credibility determination. Goff, 421 F.3d at 793. See also Milan v. Astrue, No. 2:09 CV 24 AGF, 2010 WL 3001877, at *8 (E.D. Mo. July 28, 2010).

Ultimately, the conflicting impact of Bradford's work history resulted in a credibility determination for the ALJ to make. Because substantial evidence supports the ALJ's decision, the decision must stand. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (the court "may not reverse merely because substantial evidence may also support an opposite conclusion").

**3. Polaski Factors**

The ALJ expressly discredited Bradford's testimony to the extent that it conflicted with his ability to work despite his impairments. The ALJ based his credibility determination on several factors, including that Bradford worked for many years despite the loss of his left eye and sinus infections. The ALJ also noted that Bradford submitted no evidence that his sinus infections were severe and chronic, as Bradford only submitted records of treatment for two sinus infections, both over a year before the alleged onset date.

The ALJ also found that Dr. Heligman's report stated that despite the possibility that Bradford has carpal tunnel syndrome, he still retained normal upper body strength, normal grip strength, and had no difficulty with gross or fine manipulation. With respect to Bradford's daily activities, the ALJ found that Bradford's ability to regularly play computer games also suggested that his carpal tunnel syndrome was not severe.

Regarding his depression, the ALJ found that Mr. Schmitz's diagnosis did not support a finding of a severe impairment, as Mr. Schmitz assigned Bradford a GAF score of 62, indicating that his symptoms were only mild, even without treatment. Mr. Schmitz also explicitly found that Bradford's depression did not hinder him from engaging in employment.

Given the lack of objective medical evidence, Bradford's daily activities, and the medical findings that Bradford's impairments were not severe, the ALJ properly considered the <u>Polaski</u> factors in discrediting Bradford's testimony.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

                                               /S/    David D. Noce
                                        **UNITED STATES MAGISTRATE JUDGE**

Signed on January 18, 2011.